IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-582

Filed 06 June 2023

Forsyth County, Nos. 18 JA 123-25

IN THE MATTER OF:

N.T., K.M., A.C.

Appeal by Respondent-Mother and Respondent-Father from order entered 28 March 2022 by Judge David E. Sipprell in Forsyth County District Court. Heard in the Court of Appeals 10 May 2023.

> *Melissa Starr Livesay, Assistant County Attorney, for Petitioner-Appellee Forsyth County Department of Social Services.*
>
> *Ellis & Winters LLP, by James M. Weiss, for Appellee-Guardian ad Litem.*
>
> *Anné C. Wright for Respondent-Appellant Mother.*
>
> *Kimberly Connor Benton for Respondent-Appellant Father.*

COLLINS, Judge.

Respondent-Mother and Respondent-Father appeal from the trial court's order ceasing reunification efforts with their minor children Nate, Kat, and Amy[1] and awarding guardianship of the children to Nate's paternal grandparents. We affirm.

---

[1] We use pseudonyms to protect the identities of the minor children. *See* N.C. R. App. P. 42.

## I.    Factual and Procedural Background

Mother is the biological mother of Nate, Kat, and Amy.  Father is the biological father of Nate and the caretaker of Kat and Amy.[2]

Forsyth County Department of Social Services ("DSS") received a report on 6 June 2018 that one-month old Nate had been admitted to Brenner's Children's Hospital with an unexplained skull fracture.  Although Mother and Father told DSS that they were the sole caretakers for Nate, neither parent could provide an explanation for Nate's injuries.  Nate was diagnosed with bilateral skull fractures, bilateral scalp hematomas, and a small extra-axial hemorrhage along the right cerebral portion of his brain.  Dr. Stacy Thomas with Brenner's Children's Hospital opined that Nate's injuries were the result of non-accidental trauma.

DSS filed petitions on 11 June 2018 alleging that Nate was abused and neglected, and that Kat and Amy were neglected.  DSS obtained nonsecure custody of all three children and placed them with Nate's paternal grandparents.  After a hearing on 17 October 2018, the trial court entered an order on 24 January 2019 adjudicating all three children neglected and ordering that custody remain with DSS.

Throughout the life of the case, Mother maintained that Nate's injuries were caused by birth trauma.  Furthermore, at a permanency planning meeting on 4 April

---

[2] Kat and Amy's putative father is not a party to this appeal.

2019, Father presented new information to DSS and the Guardian ad Litem ("GAL") regarding the possible cause of Nate's injuries:

> The Father placed [Nate's] car seat on the ground. [Amy] and [Kat] were in the back seat of the car arguing and the Father attempted to stop the girls from arguing when his foot hit [Nate's] car se[a]t and [Nate] slipped out of the car seat onto the ground. The Mother was in the passenger seat but did not witness the accident. The Mother asked what happened after hearing [Nate] cry, the Father stated nothing.

The trial court entered a permanency planning order on 15 May 2019, setting a primary plan of guardianship and a secondary plan of reunification. Following a hearing on 1 July 2020, the trial court entered an order on 31 August 2020 ceasing reunification efforts with Mother and Father, eliminating reunification as a secondary plan, and awarding guardianship of all three children to Nate's paternal grandparents. Both Mother and Father appealed, and this Court vacated the permanency planning order and remanded to the trial court to "determine whether Nate is an Indian Child for purposes of ICWA and to ensure compliance with ICWA's notice requirements." *In re N.T.*, 278 N.C. App. 811, 860 S.E.2d 343 (2021) (unpublished).

On remand, the trial court held an additional hearing on 21 February 2022 before entering an order on 28 March 2022 finding that ICWA did not apply, ceasing reunification efforts, eliminating reunification as a secondary plan, and awarding guardianship of all three children to Nate's paternal grandparents.

Mother and Father timely appealed.

## II.    Discussion

### A. Standard of Review

"This Court reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition." *In re M.T.*, 285 N.C. App. 305, 322, 877 S.E.2d 732, 746 (2022) (quotation marks and citations omitted). "An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." *In re J.M.*, 276 N.C. App. 291, 299, 856 S.E.2d 904, 910 (2021) (quotation marks and citation omitted). "At the disposition stage, the trial court solely considers the best interests of the child. . . ." *In re J.H.*, 373 N.C. 264, 268, 837 S.E.2d 847, 850 (2020) (quotation marks and citation omitted).

The trial court's findings of fact are conclusive on appeal if supported by any competent evidence, notwithstanding contrary evidence in the record. *In re C.M.*, 273 N.C. App. 427, 430, 848 S.E.2d 749, 751-52 (2020). The trial court's conclusions of law are reviewed de novo. *In re K.L.*, 254 N.C. App. 269, 272-73, 802 S.E.2d 588, 591 (2017).

## B. Reunification

Mother and Father both contend that the trial court erred by ceasing reunification efforts and eliminating reunification as a permanent plan because the findings of fact made pursuant to N.C. Gen. Stat. § 7B-906.2 are not supported by competent evidence.

At a permanency planning hearing, reunification shall be a primary or secondary plan unless, inter alia, the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety. N.C. Gen. Stat. § 7B-906.2(b) (2022). The trial court must also make written findings of fact concerning:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C. Gen. Stat. § 7B-906.2(d) (2022).

Here, the trial court made the following findings of fact:

> 39. The [c]ourt ordered the Respondent Mother . . . to comply with all of the following in order to correct the circumstances which caused the children's removal from her care and custody and adjudication if she wished to be reunified with the children:

a. **Notify FCDSS of any changes in address, telephone number, income, employment, or household composition within 24 hours:**

[Mother] has reported that none of this information has changed with the exception of her having a baby in January 2022. Since this case has been pending and [Nate], [Kat], and [Amy] have been removed, [Mother] has had three children.

b. **Comply with any recommendations made as a result of the parenting capacity assessment completed and provide any and all documentation regarding how [Nate] received his injuries other than birth trauma:**

[Mother] reports that she continues to attend individual counseling with Ms. Anne Doherty monthly. However, when asked if therapy was helpful or beneficial, [Mother] responded that it was not beneficial or helpful, but stated she "will keep trying it." Previously, [Mother] signed a limited release which only allowed her attorney to obtain her records. Therefore, FCDSS has never received any mental health records to be able to verify that [Mother] is attending therapy or the nature of objective of the therapy attended.

On February 8, 2022, FCDSS Social Work Supervisor Burleson received release of information forms from Attorney Mortis for [Mother's] mental health records. Supervisor Burleson then requested records from Ms. Doherty. To date, FCDSS has not received any records.

As of January 2022, [Mother] has not provided any additional information or documentation to FCDSS regarding how [Nate] received his injuries, other than birth trauma and the incident with the car seat that was provided to the [c]ourt at the April 12, 2019 Permanency Planning Hearing.

On February 4, 2020, FCDSS received documentation from Stokes County DSS, the county

in which [Mother] and [Father] have resided since after the children's removal. The documentation shows that [Mother] told a CPS worker on September 12, 2020, "I don't know how he got the injury. I guess I should have just told them my other kid did it or something. I can't lie." More recently, on June 2, 2020, [Mother] reported that she believes that [Nate] has a medical disorder that would account for his injuries. She reported that she continues to believe that birth trauma could be a cause of his injuries.

As of January 2022, [Mother] continues to report to FCDSS that birth trauma is the cause of [Nate's] injuries.

c. **Maintain a safe and stable living environment:**

FCDSS went out to the home of [Father] and [Mother] on November 24, 2021 and observed the parents in the home with two toddlers. The home was sufficiently baby-proofed, however there were stacks of items throughout the home that were out of reach of the children at that time, however, could pose an issue as the children grow and become more mobile. The family is making plans to repurpose their garage into a room for the older girls to share, there is a bedroom for the three children who remain in [Father] and [Mother's] custody, and a bedroom for [Nate].

In her testimony, Supervisor Burleson acknowledged that she observed no safety concern in [Mother and Father's] home. However, Supervisor Burleson was not at the home to assess the safety and welfare of the three children who reside with [Mother] and [Father]. Supervisor Burleson's observation was that the home was a physically safe location for the children and there were no apparent issues with the two children who were present in the home at the time of her visit.

d. **Demonstrate the ability to meet the basic**

**needs of [Amy], [Kat], and [Nate]:**

[Nate's paternal grandparents] report that the parents have provided items for the children, such as clothing, snacks, and toiletries and financial support.

e. **Demonstrate skills learned in parenting classes during visitation with [Amy], [Kat], and [Nate]:**

Per reports of the children, caregivers and parents, the visits have been going well and earlier in COVID it was harder to have visits in person. The family reports that they have 8 hours of visitation per week, however, when looking at the closing court order from July 2020, the parents were to get a minimum of 4 hours per week.

[Nate's paternal grandparents] have expressed that the 8 hours per week poses a hardship at times as they want to follow the [c]ourt's order, however with the parents' work schedules, 8 hours per week presents a challenge. FCDSS would be recommending no more than 4 hours per week.

[Mother] and [Father] try to make valuable use of the time to engage the older girls in activities and crafts. [Father], due to his work schedule at nights, calls the children in the morning before going to school and speaks with them.

. . . .

41. Around June 2, 2020, [Mother] reported that she was going monthly for counseling, but she stopped for two months. At that time in regards to her sessions, [Mother] reported that "They're going," "I talk to her," and "We're working on stuff." [Mother] would not provide more information to FCDSS about what she is learning in sessions or her therapeutic goals.

. . . .

44. The Respondent Father . . . was ordered to comply with all of the following in order to correct the circumstances

which caused his child's removal from his care and custody and adjudication if he wished to be reunified:

> a. **Notify FCDSS of any changes in address, telephone number, income, employment, or household composition within 24 hours:**
>
> [Father] reports the only change for him is his employment. He is now employed . . . driving a forklift and currently works 2nd shift as of September 2021.
>
> b. **Comply with any recommendations made as a result of the parenting capacity assessment completed and provide any and all documentation regarding how [Nate] received his injuries other than birth trauma:**
>
> [Father] reports that he continues to be engaged with Mr. George Hage with Counseling and Spirituality and going monthly. FCDSS has inquired about the releases for Mr. Hage and [Father] reported FCDSS would have to get those from his attorney.
>
> As of February 18, 2022, FCDSS had not received any releases for [Father], therefore has no records for verification that he is attending therapy or the nature or goals of any therapy attended.
>
> [Father] has not provided any additional information or documentation to FCDSS regarding how [Nate] received his injuries, other than birth trauma and the incident with the car seat that was provided to the [c]ourt at the April 12, 2019 Permanency Planning Hearing. [Father] concurs with [Mother] that [Nate] may have a medical condition or that the injuries in question were caused by birth trauma.
>
> c. **Maintain a safe and stable living environment:**
>
> FCDSS went out to the home of [Father] and [Mother] on November 24, 2021 and observed the

parents in the home with 2 toddlers. The home was sufficiently baby-proofed, however there were stacks of items throughout the home that were out of reach of the children at that time, however, could pose an issue as the children grow and become more mobile. The family is making plans to repurpose their garage into a room for the older girls to share, there is a bedroom for the 2 toddler and now new infant to share and then a bedroom for [Nate]. The home is in good condition and was appropriate.

d. **Demonstrate the ability to meet the basic needs of [Amy], [Kat], and [Nate]:**

[Nate's paternal grandparents] report that the parents have provided items for the children, such as clothing, snacks, and toiletries and financial support.

e. **Demonstrate skills learned in parenting classes during visitation with [Amy], [Kat], and [Nate]:**

Per reports of the children, caregivers and parents, the visits have been going well and earlier in COVID it was harder to have visits in person. The family reports that they have 8 hours of visitation per week, however, when looking at the closing court order from July 2020, the parents were to get a minimum of 4 hours per week. The relatives have expressed that the 8 hours per week poses a hardship at times as they want to follow the courts order, however if the parents' work schedules, 8 hours per week presents a challenge. FCDSS would be recommending no more than 4 hours per week. [Father] and [Mother] try to make valuable use of the time to engage the older girls in activities and crafts. [Father], due to his work schedule at nights, calls the children in the morning before going to school and after school and speaks with them.

. . . .

46. [Father] reported to FCDSS that he continues to be

engaged in counseling with Mr. George Hage and he attends monthly. [Father] would not provide more information about what he is learning in sessions and or the nature or goals of his therapy. In November 2021, [Father] reported to FCDSS Social Work Supervisor Dana Burleson that he doesn't feel therapy is beneficial, stating "It provides a little bit of help towards other topics but not towards this situation." FCDSS has not received releases by [Father] to request records from Mr. Hage. FCDSS has also reached out to his attorney for assistance in obtaining signed releases. As of February 18, 2022, FCDSS has not received signed releases or records from Mr. Hage. During the hearing on February 21, 2022, [Father] provided documentation to FCDSS regarding his work with Mr. Hage.

. . . .

58. FCDSS has had difficulty throughout the life of this case in communicating with the parents. The parents have not willingly provided information when requested by FCDSS. Despite this difficulty, FCDSS has received information that the parents complied with classes and assessments.

. . . .

105. The minor children cannot return to the home or care of a parent immediately, within the next six months, or within any reasonable period of time.

106. The immediate return of the minor children to the home of a parent would be contrary to their health, safety, and welfare.

107. Further reunification efforts would be clearly unsuccessful and inconsistent with the minor children's health and safety. The children have been outside of the parents' home and care for approximately 1,350 days. The cause of [Nate's] injuries remains unknown. The causal or contributing factors leading up to and surrounding [Nate's] injuries remain unknown. It is unlikely more information will be gained by the passage of more time, and further delay to the children's permanence is not in their best

interests.

114. Pursuant to NCGS §7B-906.2, the permanent plan of reunification would not be successful because:

> a. The parents have not made adequate progress within a reasonable period of time towards the objective of reunification. While the parents have attended services, the intended purpose and benefit of the services has not been achieved; IE: The parents have attended therapy sessions. However, the therapy sessions have not examined the causes or circumstances surrounding [Nate's] injuries while in the parents' care.

> b. The parents have not been cooperative or forthcoming with FCDSS or the GAL program. FCDSS has been unable to effectively communicate and gain necessary information from the parents.

> c. The parents are present and available to the [c]ourt today. The parents have not been regularly available to FCDSS and the GAL outside of court.

> d. The parents have acted in a manner that is inconsistent with the health or safety of the minor children. After more than 1,300 [days] outside the home and care of the Respondent Parents, there is no information about the cause of [Nate's] injuries or the circumstances which led to those injuries while in the care of [Mother] and [Father].

In making these findings, the trial court considered testimony from DSS Social Work Supervisor Dana Burleson, GAL District Administrator Melissa Bell, Nate's paternal grandfather, Mother, and Father. The trial court also considered reports from DSS, the GAL, and Mother. Finally, the trial court considered letters from Ann Doherty, Mother's therapist, and George Hage, Father's therapist. This competent evidence supports the trial court's findings of fact, even if there exists contradictory

evidence in the record. *In re C.M.*, 273 N.C. App. at 430, 848 S.E.2d at 751-52; *see also In re J.A.M.*, 372 N.C. 1, 11, 822 S.E.2d 693, 700 (2019) ("[A]n important aspect of the trial court's role as finder of fact is assessing the demeanor and credibility of witnesses, often in light of inconsistencies or contradictory evidence. It is in part because the trial court is uniquely situated to make this credibility determination that appellate courts may not reweigh the underlying evidence presented at trial.").

Accordingly, the trial court did not err by ceasing reunification efforts because its findings of fact under N.C. Gen. Stat. § 7B-906.2 are supported by competent evidence.

## C. Guardianship

### 1. *Unfitness/Acting Inconsistently with Constitutionally Protected Status*

Mother contends that "[t]he trial court should not have applied a best interest standard as in doing it failed to protect [Mother's] constitutional rights as a parent." Similarly, Father contends that the trial court erred by applying "the best interest of the child standard in awarding guardianship of Nate to the paternal grandparents as there was insufficient evidence his father was unfit or had acted inconsistently with his constitutionally protected rights as a parent."

"A parent has an interest in the companionship, custody, care, and control of his or her children that is protected by the United States Constitution." *Boseman v. Jarrell*, 364 N.C. 537, 549, 704 S.E.2d 494, 502 (2010) (quotation marks, brackets,

and citations omitted). "So long as a parent has this paramount interest in the custody of his or her children, a custody dispute with a nonparent regarding those children may not be determined by the application of the 'best interest of the child' standard." *Id.*, 704 S.E.2d at 503 (citation omitted). "However, a parent can forfeit their right to custody of their child by unfitness or acting inconsistently with their constitutionally protected status." *In re J.M.*, 276 N.C. App. at 307, 856 S.E.2d at 915 (citation omitted). "Findings in support of the conclusion that a parent acted inconsistently with the parent's constitutionally protected status are required to be supported by clear and convincing evidence." *In re K.L.*, 254 N.C. App. at 283, 802 S.E.2d at 597 (citation omitted).

Here, the trial court made the following relevant findings:

> 116. The Respondent [Mother] is not a fit and proper person to have the care, custody, and control of the minor children concerned. [Nate], [Kat], and [Amy] were adjudicated neglected individuals after [Nate] sustained non-accidental injuries in the care of [Mother] and [Father]. The cause of and circumstances surrounding those injuries remain unknown and unaddressed.
>
> 117. The Respondent [Mother] has acted in a manner that is inconsistent with her constitutionally protected status as a parent. While [Mother] has occasionally provided financial support and necessary items for the care of these three minor children, [Nate's paternal grandparents] have assumed the primary responsibility for financially supporting and meeting the children's needs since June 11, 2018.
>
> 118. The Respondent Father . . . is not a fit and proper person to have the care, custody, and control of the minor child [Nate]. [Nate] and his siblings [Kat] and [Amy] were

adjudicated neglected juveniles after [Nate] sustained non-accidental injuries in the care of [Mother] and [Father]. The cause of and circumstances surrounding those injuries remain unknown and unaddressed.

119. The Respondent [Father] has acted in a manner that is inconsistent with his constitutionally protected status as a parent. While [Father] has occasionally provided financial support and necessary items for the care of [Nate], [Nate's paternal grandparents] have assumed the primary responsibility for financially supporting and meeting the child's daily needs since June 11, 2018.

Although labeled as findings of fact, the trial court's determinations that Mother and Father were unfit and acting inconsistently with their constitutionally protected status are conclusions of law that we review de novo. *In re Estate of Sharpe,* 258 N.C. App. 601, 605, 814 S.E.2d 595, 598 (2018) ("If the lower tribunal labels as a finding of fact what is in substance a conclusion of law, we review that 'finding' as a conclusion *de novo.*" (citation omitted)).

To support these conclusions, the trial court made the following relevant findings of fact:

46. [Father] reported to FCDSS that he continues to be engaged in counseling with Mr. George Hage and he attends monthly. [Father] would not provide more information about what he is learning in sessions and or the nature or goals of his therapy. In November 2021, [Father] reported to FCDSS Social Work Supervisor Dana Burleson that he doesn't feel therapy is beneficial, stating "It provides a little bit of help towards other topics but not towards this situation." FCDSS has not received releases by [Father] to request records from Mr. Hage. FCDSS has also reached out to his attorney for assistance in obtaining signed releases. As of February 18, 2022, FCDSS has not

received signed releases or records from Mr. Hage. During the hearing on February 21, 2022, [Father] provided documentation to FCDSS regarding his work with Mr. Hage.

. . . .

59. FCDSS continues to have the same primary concern that inadequate information has been provided as to how [Nate] was injured. Without this information, FCDSS cannot adequately assess how to correct safety concerns in the parents' care or confirm that the children would now be safe if returned to the home and care of [Mother] and [Father].

. . . .

92. The therapy letter provided by [Mother] reflects that her goals in therapy were "the importance of her professional communication even in a situation where she reported feeling lack of control as well as confusion and helplessness." [Mother] acknowledged the purpose of that goal was for her to be able to communicate with the Social Workers about the case without becoming angry. The second therapy goal was "adjustment to the loss of her children." [Mother] acknowledged the purpose of that goal was for her to be able to manage her feelings regarding the placement of her children in DSS custody.

93. Nothing in the letter from clinician Ann Doherty reflects that [Mother] was working on therapy goals related to exploring the effects of stress around the time of [Nate's] injuries in 2018 or exploring the circumstances surrounding [Nate's] injuries.

94. The letter provided by [Father] reflects that his goals in therapy related to "developing a sense of peace and acceptance of the separation of his three children from him," and managing symptoms of anxiety and "occurrences of depression."

95. It appears that [Father] did speak with his therapist during two sessions on February 22, 2020 and January 15, 2022 about [Nate's] injuries. However, it appears the information shared was limited to the theory of the fall

from the car seat, as presented in 2019. Counselor Hage wrote: "[W]e have also dealt with concerns and stressors related to his son's fall. [Father] reports no major incident or disorder with [Nate] from his birth up until the incident. He certainly regrets the accident happening with the child due to not buckling him with the seat belt into his car seat . . . I see the accident as something that happened in the split seconds of sudden distraction of two children fighting in the car, thereby, putting the parents in an insupportable position."

96. Nothing indicates that new information has been gained about the circumstances surrounding [Nate's] injuries or that the circumstances surrounding [Nate's] injuries were ever addressed through the Respondent Father's participation in therapy.

97. From 2019 to the present, neither [Mother] nor [Father] have provided a sufficient explanation about how [Nate] was injured while in their care, accepted responsibility for the injuries, or provided insight into the circumstances surrounding [Nate's] injuries.

98. In the absence of information about how [Nate] sustained the injuries in question and with no information about the causal and contributing factors surrounding those injuries, the [c]ourt is unable to find that the circumstances which led to the removal of [Nate], [Kat], and [Amy] from the home and care of [Mother] and [Father] and the children's subsequent adjudication have been adequately corrected such that the children can safely reunify with the parents.

The trial court made these findings after considering testimony from DSS Social Work Supervisor Dana Burleson, GAL District Administrator Melissa Bell, Nate's paternal grandfather, Mother, and Father; reports from DSS, the GAL, and Mother; and letters from Ann Doherty, Mother's therapist, and George Hage, Father's therapist. Accordingly, clear and convincing evidence supports the trial court's

findings of fact.

These findings of fact, in turn, support the trial court's conclusions of law that Mother "is not a fit and proper person to have the care, custody, and control of the minor children" and that Mother "acted in a manner that is inconsistent with her constitutionally protected status as a parent." Furthermore, these findings of fact support the trial court's conclusions of law that Father "is not a fit and proper person to have the care, custody, and control of the minor child" and that Father "acted in a manner that is inconsistent with his constitutionally protected status as a parent."

### 2. *Best Interests Determination*

Mother contends that "[t]he trial court's decision regarding the children's best interest is not supported by reason and is an abuse of the trial court's discretionary latitude at disposition." Furthermore, Father contends that the trial court's "determination of Nate's best interest is not supported by reason and is an abuse of the court's discretion at disposition."

Here, the trial court made the following relevant findings of fact:

> 85. [Nate] entered FCDSS custody in June 2018 after sustaining serious, life threatening injuries due to non-accidental means. The cause of the injuries, as identified by Dr. Thomas, was blunt force trauma. [Nate's] siblings [Kat] and [Amy] were present in the same home and in the care of the same adults as [Nate] when he was injured.
>
> . . . .
>
> 87. Since the children entered FCDSS custody, [Mother] and [Father] have given two explanations for how [Nate's]

injuries occurred: birth trauma and a fall from a car seat.

88. Based upon the record, the theory of birth trauma was previously presented. The [c]ourt did not accept that theory, as it directed the parents to present any explanations they could offer besides birth trauma.

89. In 2019, [Father] identified a fall from a car seat onto the ground as the cause of the injuries [Nate] sustained. In 2019, FCDSS and the GAL followed up on this reported cause with Dr. Thomas, who advised the injuries were highly unlikely to have been caused by such a fall and identified blunt force trauma as the cause of the injuries.

90. At the hearing today, February 21, 2022, when asked how [Nate] sustained the injuries in question, [Mother] did not provide any new or additional information. [Mother] again referenced birth trauma. [Mother] did not elaborate as to why she believed [Nate's] injuries resulted from birth trauma, nor did she present any new evidence to support the birth trauma theory. [Mother] stated she was unwilling to exclude birth trauma as a cause of these injur[i]es until such time as she personally spoke to a doctor about her beliefs.

91. At the hearing today, February 21, 2022, when asked how [Nate] sustained the injuries in question, [Father] denied the injuries were the result of non-accidental trauma. He identified an accidental explanation, the fall from the car seat as presented in 2019. [Father] did not present any new or additional evidence or information to support his theory that car seat incident caused the injuries.

. . . .

96. Nothing indicates that new information has been gained about the circumstances surrounding [Nate's] injuries or that the circumstances surrounding [Nate's] injuries were ever addressed through the Respondent Father's participation in therapy.

97. From 2019 to the present, neither [Mother] nor [Father] have provided a sufficient explanation about how [Nate] was injured while in their care, accepted responsibility for

the injuries, or provided insight into the circumstances surrounding [Nate's] injuries.

98. In the absence of information about how [Nate] sustained the injuries in question and with no information about the causal and contributing factors surrounding those injuries, the [c]ourt is unable to find that the circumstances which led to the removal of [Nate], [Kat], and [Amy] from the home and care of [Mother] and [Father] and the children's subsequent adjudication have been adequately corrected such that the children can safely reunify with the parents.

. . . .

123. It is in the best interests of the minor children and will promote the children's health, safety, and welfare to be placed into the Guardianship of [Nate's paternal grandparents].

. . . .

128. The plan of care which is in the best interests of [Nate], [Kat], and [Amy] is for [Nate's paternal grandparents] to be appointed as their Guardians, and as Guardians for [Nate's paternal grandparents] to have the physical and legal custody of the children, with visitation . . . .

These findings are supported by the same competent evidence that supported the trial court's findings regarding reunification efforts. Accordingly, the trial court did not abuse its discretion by awarding guardianship to Nate's paternal grandparents.

## III.    Conclusion

The trial court did not err by ceasing reunification efforts, eliminating reunification as a permanent plan, and granting guardianship of Nate, Kat, and Amy to Nate's paternal grandparents. Accordingly, we affirm.

AFFIRMED.

Judges DILLON and STADING concur.